The White's Creek Turnpike Co., v. John W. Marshall *et al.*

## THE WHITE'S CREEK TURNPIKE COMPANY *v.* JOHN W. MARSHALL *et al.*

STATEMENT OF CASE: The County Court of Davidson, by virtue of the Act of 1835, ch. 54, Code, § 1277, appointed three superintendents, " to look over the several turnpikes, roads and toll-bridges within the county, and see that the same are kept in such repair as is required by law; " and these superintendents ordered the gates of the White's Creek Turnpike Company to be thrown open, under § 1282 of the Code. The Turnpike Company filed its bill against the commissioners, seeking to enjoin their action in this respect, and admitting that the road was not in such condition as required by the charter, but setting up the Act of the 9th of January, 1865, as a legislative pardon, and alleging compliance with said act, and claiming that neither the County Court nor the superintendents had any legal right to act in the premises. The Court held:

1. TURNPIKE. *Public road. County Court. Commissioners. Jurisdiction of Chancery Court.* The Chancery Court had jurisdiction of this case, because complainant had no full or adequate remedy at law.

2. SAME. *Same. County Court. Power to appoint superintendents.* The County Court has no jurisdiction over turnpikes before forfeiture is declared, except to appoint the superintendents, as required by the Act of 1835, and this only upon the assumption

The White's Creek Turnpike Co., *v.* John W. Marshall *et al.*

that the Act of 1835 is constitutional and valid, which the Court discusses, but declines to decide.

3. SAME. *Same.* *Same.* Whether the Act of 1835 is constitutional or not, it is no part of the duty of the County Court or superintendents to determine whether or not the turnpike company had complied with the Act of 1865.

4. SAME. *Same.* *Same.* The Act of 1865 was a legislative pardon to the turnpike company which had complied with the same, against the penalties of the Act of 1835, or other penalties provided by its charter for allowing the road to get out of repair.

5. SAME. *Same.* *Same.* The County Court has no power to control the action of the three superintendents appointed by it.

6. SAME. *Same.* *Injunction.* *Demurrer.* The injunction was properly granted and the demurrer properly overruled.

7. SAME. *Mandamus.* *Conditional pardons.* *"Due process of law."* The Court discusses the question of mandamus, conditional pardons, "due process of law," incidentally, but rests the decisions upon the above points.

Cases cited: Simpson *v.* The State, 10 Yerg., 525; *Ex parte* Nash, Queen's Bench, 93; 13 Pet. 279; 4 Wall., 522; 17 Howard, 225, 284; 1 Cranch., 137; 14 Pet. 479; 12 Barb., 215–17, 166, 24, 156, 217, 162, 52, 15, 607; 10 Johnson, 485; 1 Wend., 318; 2 Hill, 456, 243; 5 Hill, 616; 23 Wend., 458; 21 Ward, 20; 11 New York, 563; 12 New York, 299; Bank of Columbia *v.* Oakley, 4 Wheat., 235.

Code construed: §§ 1182, 1277 to 1283–8.

FROM DAVIDSON.

Appeal from the Chancery Court. EDWARD H. EAST, Chancellor.

DEMOSS and MALONE for the Turnpike Company.

JOHN C. THOMPSON, F. WILLIAMS and THOMAS L. DODD for John Marshall *et al.*

McFARLAND, J., delivered the opinion of the Court.

The bill charges that the White's Creek Turnpike

Company was organized under a charter granted by the Legislature on the 2d day of January, 1830. We find, however, that an Act was passed in 1842, appointing commissioners in the place of the former commissioners, and granting to them the powers contained in the original charter. In 1844 another Act was passed authorizing the Nashville Bridge Company to subscribe stock in the White's Creek Turnpike Company, and from this Act it appears that said turnpike company was not then organized, or the road constructed; and although the case now stands upon a demurrer, we are inclined to think that we may look to these public laws, and from this arrive at the conclusion that the company was not organized until after the date of this last Act in 1844. Though it is true, as the bill charges, that the charter under which the company was organized was originally passed in 1830, this original charter contained a provision that upon the failure of the company to keep the road in repair, any one may give notice thereof to a Justice of the Peace, who shall summon three freeholders to meet at the place complained of, and if said freeholders, or any two of them, shall find the road to be out of repairs within the intent and meaning of the Act, the tolls shall cease until the defective part is put in repair, and the person entrusted with the repair shall be subject to a fine of ten dollars—one-half to the informer. After the date of the original charter, but before the acceptance thereof and organization of the company (to-wit,

in 1835), an Act was passed, known as the "Turnpike Act." This Act, in substance, provides that the County Court shall appoint three commissioners or superintendents of turnpike roads and bridges, whose duty shall be to see that said roads and bridges are kept in repair as required by law, and when in the opinion of a majority of said commissioners the roads are in bad condition, they shall have power to open the gates until the road is put in good order; and to open the gates, or take toll, or obstruct the road during the time the gate is required to be closed, is made a misdemeanor, and subjects the offender to fine and imprisonment.

This Act was brought into the Code with the additional provision that upon conviction for opening the gates or taking toll, etc., during the time the gate is required to be closed, shall operate as a forfeiture of the charter. One of the questions argued in this case is, whether the provisions of the complainant's charter or the obligation of the contract contained in the charter are impaired by adding material restrictions not contained therein, and providing means by which the complainant's property and franchises are to be taken without due process of law?

On the 9th of January, 1865, an Act was passed, as follows: "That with a view to the relief of the traveling community generally, and the incorporated turnpike companies of the State, permission is granted said turnpike companies to collect toll at their several gates, the proceeds of the same, after paying the

expenses of collection, shall be appropriated to the repair of the said roads, till the same are made equal to the requirements of the original charter, when this section shall cease to have any further effect." This Act was repealed by the Act of March 7, 1867. And again this repealing clause was repealed by the Act of the 16th of January, 1868. The bill in this case charges that by the results of the war its road had fallen below the requirements of the charter, and this was the general condition of such roads in this State; and in view of this the Act of the 9th of January, 1865, was passed; that this Act was accepted as an amendment of its charter, and again accepted when the Act was restored on the 16th day of January, 1868. The bill further charges that the net proceeds of the toll (and more) have been employed in repairing the road ever since the Act of 1865, and though not in so good order as the owners desire, it is above the average and really one of the best roads in the county. It is not averred to be up to the requirements of the charter.

The bill further charges that recently, before it was filed, the defendants (John G. Marshall and John Howe), who, together with defendant, made *profert* to have been appointed by the County Court of Davidson Superintendents of Turnpikes, have notified the President that the road is not in good condition, and requiring him to open the gates. The copy of the notice is exhibited. It directs the gates to be kept open until the road is repaired as the law

requires.    The bill prays for an injunction restraining the said commissioners and County Court of Davidson County from interfering. with the rights and franchises of the company.    The Chancellor overruled a demurrer to this bill, but allowed an appeal to this Court before taking further action.    The grounds of demurrer raises the question as to the complainant's right to relief upon these facts.    The complainant's counsel have argued in favor of their right to relief, mainly upon the ground that the Act of 1835 is unconstitutional as to their rights vested under its charter, not because they express less confidence in the other questions involved, but because they greatly desire a decision of this question.    If the decision of this question is essential to the decision of this case, we must of course decide it.

We have been furnished with the able opinion of the Chancellor, in which the grounds of his decision are clearly set forth, and, while he argues strongly against some features of the Act of 1835, he does not rest his decision on the ground that the Act is unconstitutional, there being in his opinion one safe ground on which to place it.

One ground of demurrer taken is that the County Court has exclusive jurisdiction of roads, and the Chancery Court has no jurisdiction to revise its action. Upon this question we adopt the opinion of the Chancellor, and hold that as long as the charter of a turnpike company is not forfeited the County Court has not jurisdiction except upon the assumption that

the Act of 1835 be valid, in which case the Court has the power to appoint the commissioners provided for, but we do not find that it has power to control or change their action.

Again, as to the right of complainant to relief upon the facts stated.. Assuming for the argument that the Act of 1835, as modified in the Code, is valid, and does not interfere with any vested rights under complainant's charter, what is the effect of the Act of 1865? If the Legislature had the right to apply the provisions of the Act of 1835 to companies previously chartered, beyond doubt it might suspend or modify these provisions at pleasure. Owing to the disasters of the war, as it is assumed, the complainants road became in bad condition, not coming up to the provisions of the charter, and for this reason the commissioners might have opened its gates and the charter might have been declared forfeited. We infer from the statements of the bill that the company was not collecting toll previous to January, 1865. In this state of affairs the Act of 1865 was passed. It fully recognizes that the roads were in bad condition, but deeming it better for the interests of the public not to have the stringent provisions of the previous law enforced, enacts that such companies may at once proceed to collect toll, without waiting to repair their roads, and apply the toll, after deducting the expenses of collecting, to repairing their roads. After this,. could the commissioners open the gates simply because the road was in bad condition?

This is what they did, according to the allegations of the bill. They notify the complainant to open the gates until the road is repaired as required by law, accompanying their notice with specifications pointing out the bad condition of the road. Admit this to be true, does it follow that the commissioners had the right to open the gates? Under the Act of 1865 the company had the right to keep its gates open and receive toll, notwithstanding its bad condition, provided its net proceeds were applied to repairing the road. It follows that the commissioners were not authorized, as they assumed to do, to close the gates simply because the road was in bad condition.

Were the commissioners authorized to take upon themselves the execution of the Act of 1865, and determine whether or not the net proceeds of the tolls had been applied to the repairing of the road; and if, in their opinion, this had not been done, to close their gates? From the allegations of the bill and exhibits, to which alone we can look, upon a demurrer, they have not assumed to act upon this ground. Nor are they charged with the duty of executing the Act of 1865. They are not referred to in the Act. Their duties, under the Act of 1835, were to inspect the road and determine whether it was in the condition required by the charter, and if not, to close the gates, and from their decision the Act provides for no appeal. How can we hold upon these Acts that the commissioners

were authorized to decide without notice, without judge or jury, or any of the processes known to the law, that the complainant had not complied with the Act of 1865, and applied the net proceeds of tolls to repairing the road, close the gates and leave the complainant without remedy, although, as the bill alleges, the company stands ready to show that in fact the Act of 1865 had been fully complied with. The commissioners are not charged with the duty of determining this question. They are not the proper tribunal to determine a question of this character, and in no case should it be determined without giving the company an opportunity to be heard. And besides all this, if they have, as the bill charges, determined this question against the truth of the case, the complainant cannot be without remedy.

This view does not deprive the State of a remedy in the event the company keeps its gates closed without repairing the road. In such case it is subject to indictment or proceeding to declare the charter forfeited. See *Simpson* v. *The State*, 10 Yerg. And it could only make a successful defence by showing that the tolls had been applied as required by the Act of 1865.

It seems to us clear that if the company has, as alleged in the bill, applied in good faith the net proceeds of the tolls to repairing the road, as provided by the Act of 1865, it had the right to keep the gates closed and receive toll, and the

The White's Creek Turnpike Co., *v.* John W. Marshall *et al.*

defendants were not justified in opening them; and against this unlawful interference the company can not be without remedy. The only ground taken in the demurrer on the question of jurisdiction is, that the jurisdiction is in the County Court. This, as we have already said, we think is not so. We are of opinion that the Chancery Court had jurisdiction. We have adopted mainly the views of Chancellor East, to whose opinion we refer, as containing a clear and more elaborate discussion of the question. And we agree with him that as this is a safe ground to rest the decision of the case upon, it is not proper to pass upon the constitutionality of the Act of 1835, until the decision of that question becomes imperative.

· The decree will be affirmed and remanded. Costs of the Court will be paid by the defendants.

### OPINION OF CHANCELLOR EAST.

The complainant (the White's Creek Turnpike Company) heretofore filed their bill in this Court, and obtained thereon a temporary injunction against John Howe, William Wade and John Marshall, commissioners or superintendents of turnpike roads in the County of Davidson, acting under an appointment from the County Court. The facts, in brief, are these:

By an Act of the Legislature passed on the 2d day of January, 1830, certain persons were empowered to build the road in question, with powers

and rights conferred in the charter, which will be noticed herein more in detail. There was no acceptance of this charter, or no action taken thereunder. Succeeding Legislatures revived this charter from session to session, until by an Act passed in 1842 the same was revived and the chartered powers conferred upon another set of men from those mentioned either in the original charter or the Acts keeping it alive. This Act recites the fact that the road had not been built, or any steps taken under the original charter. In 1835 the Legislature passed a general law relative to turnpike roads. By § 1 of the Act, "the several County Courts were required to appoint three commissioners, whose duty it was made to look over the several turnpikes and toll-bridges within their respective counties, and see that the same are kept in such repair as is required by law, and whenever, in the opinion of said superintendents, the said turnpike or toll-bridges shall manifestly be in a bad condition, a majority of said commissioners or superintendents shall have power to open the gates of said public ways until the same shall be put in good order and condition.

Section 2 declares that any owner or grantee of a turnpike or toll-bridge, or other person who shall receive any toll, or demand the same after, for and during the time the commissioners have required the gates to remain open, shall be guilty of a misdemeanor, and be liable to an indictment or presentment, and upon conviction shall be fined in a sum

not exceeding one hundred dollars, and may also be imprisoned.

Section 4 enacts that if the owners of the road or bridge shall refuse, for the space of six months, to put the same in good repair, the Attorney General should issue a *scire facias* in the name of the State, requiring the owners to show cause why the charter should not be forfeited.

By Section 6 these commissioners were required to take in *open* court, a prescribed oath to do equal and impartial justice, etc. The punishment for allowing the road to get out of repair, as fixed by the charter in this case, was different from the one prescribed in this Act of 1835. By the charter three freeholders and a Justice of the Peace were made a tribunal to try the question of the condition of the road, with power to inflict a fine of ten dollars or more.

The arguments made to the Court relate first to the question whether the charter is to be regarded as having been passed in 1830, and if so, the question of the right of the Legislature to change the mode of punishment and penalty for the road being out of repair from the mode and penalty prescribed. Secondly, if it is not to be regarded as having been passed in 1830, then assuming that it was passed in 1842, and became at this date a vested right, whether the Act of 1835, with its mode of punishment and its penalties, change the same as prescribed by the charter, or whether the remedy of the State, as regu-

lated in the charter, is exclusive of all others, and not merely cumulative.

The present incorporation had no interest, vested or otherwise, in the charter or benefits secured by it, until the Act of 1842 revived it for their benefit, nor then until they had accepted it, and the fact that the Act had been passed in 1830 is no avail to them. It is to be regarded as having been passed as a whole, for the first time, in 1842, at the date of the Act of revivor. They had no rights under the charter to be impaired under the Act of 1835. But does not this involve another difficulty? Here we have the Act of 1835, with its modes of procedure and its penalties, in full force at the time the charter is passed and accepted—the remedies reserved to the State being wholly different in the one from the other. Do remedies to be applied by the State against offending corporations, which remedies are recognized by a general law, enter into and become a part of the charter? If no remedy is prescribed in the charter, we say yes. But suppose the Legislature should prescribe in the charter one wholly different from the one allowed in the general law, and the State should undertake to enforce the one prescribed by the general law, could the corporation insist that the State was bound by the contract, and that the specific remedy was alone applicable? The Legislature may prescribe to itself other remedies, cumulative to the one prescribed in the charter, by

an Act subsequent to the charter, has been decided
in this State in the case of *Simpson* v. *The State*, 10
Yerg., 525. Now, if it is empowered to change or
to add others by an Act subsequent, it would be
hard to prove that it had not the power to do it
by Act previous to the charter. In such a case the
question seems to me to be not so much one of leg-
islative power as of legislative intent and construc-
tion. Legislative power over remedies is so great
and is open to so much discussion, the tendency of
the best adjudicated cases being favorable to an en-
largement of the same, and giving a liberal construc-
tion to such statutes, inclines me to the opinion that
it possess the power alluded to, and that it would
be the duty of the Courts to construe the statutes as
intending to enlarge remedies. Where rights are not
affected very little danger can arise from merely reme-
dial statutes. Every person and corporation has a
right to some remedy, while neither has a vested
right to a specific remedy, in any sense in which the
same may be said to be secured by the Constitution.

The bill alleges that the commissioners appointed
by the County Court have opened all the gates upon
the road of complainant, and denies the constitution-
ality of the Act of 1835 empowering them to do so.
The demurrer to the bill denies the jurisdiction of
the Court to enjoin the same, and insists that the
jurisdiction of the County Court is complete for all
purposes; that complainant may be heard in that
Court, and that that has by law original and exclusive

jurisdiction of roads, including turnpikes. If the latter proposition of the jurisdiction of County Courts over roads of this character be good in law, then it was wrong to have granted the injunction, and would · be wrong to continue it, and the bill is without merits, and the demurrer should be sustained and the bill dismissed. That the County Court has *any* jurisdiction over turnpike roads, or railroads, or any other roads than the four classes designated in § 1182 of the Code, I have been unable to discover. It can not order a turnpike to be built; it can not charter one; it can not give a road the right to collect toll; it can not deprive one of its charter, nor could it discontinue one. That it has large powers over the four classes of roads designated in said section is quite true, but it has not *exclusive* jurisdiction over these; all the power it has, relative to turnpikes, is derived from the Act of 1835, carried into the Code, from § 1277 to § 1283, inclusive. Let us now examine that Act, and see what powers it confers upon the County Courts. It confers the power upon the County Court, a majority of the Justices being present, to appoint three superintendents, whose duty shall be, etc., etc. Here the Legislature has delegated to that Court a power of appointment merely. It might have delegated the same power to any other Court, or to the sheriff of the county, or might have made the appointment itself. Who is the County Court to appoint? The Acts answer the question in the negative: "No person who is connected with the

owners of said roads, etc., by consanguinity, or affinity, or interested in the profits or tolls arising from them." Here is a limitation upon the power of the Court. I mention these with a view to meet the argument that was made to the effect that as the three persons who were appointed in the case were themselves Justices, and members of the County Court, that this fact made it the act of the *Court,* as such. The County Court could as well have appointed any citizen of the county as one of their number, and perhaps would have by so doing fallen within the spirit of the Act. As these superintendents are to be paid such compensation as the County Court may allow them, and which is to be paid by the roads (§ 1283), and they being members of the Court, and as such empowered to vote upon the question of the amount to be allowed themselves, it would seem to warrant the inference that the Legislature never intended that members of the Court should be appointed. Be this however as it may, it can not for a moment warrant the conclusion that the action of these superintendents is the judicial action of that Court. These superintendents, when appointed, become a separate and distinct body of men from the Court; the Court could not enlarge or diminish their powers; has no jurisdiction over them; can not compel them to act, as it can its ordinary officers; in short, they are put under the obligation of an oath wholly different from that of the Court, as its members. The appointment by the Court is a conclusion of its power; it exhausts

all its power in making the appointments. If the commissioners were to throw open every gate in the county, wrongfully and unlawfully, the County Court could not sit upon and reverse their action any more than they could the official action of a sheriff or revenue collector elected by that body, as was allowed formerly. The gates are to be thrown open or not, as a "majority of said superintendents" shall determine, not as the *Court* shall determine.

Upon the point of jurisdiction of County Courts over turnpikes, this jurisdiction *may* arise and be fully established by §§ 1288 and 1289, but does not occur until there has been a judgment of forfeiture; before this judgment it has only the power to appoint commissioners. I conclude this branch of the subject with the determination that if the owners of the road were now to go before the County Court and ask that Court to revise and reverse the action of the commissioners, it would have no power to entertain the motion, and any action it might take would be a mere nullity, and to undertake to do so would, besides being unlawful, be wholly impracticable to so large and unwieldy a body. No appeal is granted from the action of the commissioners to any Court; no provision is made to have the matter adjudicated elsewhere. The next step, if the owners of the road do not submit to the verdict of the commissioners, but instead thereof proceed to demand or collect toll, is an indictment or a proceeding for a forfeit—one or both; and these occur when toll is demanded "while

the gate is required to be kept open by the *superintendents*; (§ 1288). The owner of turnpike roads, feeling aggrieved by the action of the commissioners, certainly have a remedy in some Court. This proposition I shall not argue. To put the property, rights, life or liberty of any man or corporation into the hands of commissioners or superintendents who are not clothed with judicial powers by the Constitution, who have no form of trial, summon before them no one, hear no witnesses, refuse to hear a party to be affected or his counsel, become judges of the law and the facts, sit iñ secret, have no place for hearing or adjudicating conflicting interest, and condemn a man without a day in Court or a hearing, would be shocking and revolting, and not to be endured for an instant. This the counsel for the defendant felt and admitted, and to avoid, claimed first that the County Court had ample jurisdiction, secondly that complainant had ample remedy (by *mandamus*) from the Courts of law.

I have concluded that the County Court had no jurisdiction in the matter, and shall proceed to consider whether complainant's remedy is by *mandamus* or injunction. As a general rule it may be said that this Court will not take jurisdiction if the complainant has a complete, adequate and unembarrassed remedy in another Court; and, if he has not this, then it is the duty of the Court to take jurisdiction. Have the owners of the road a "complete, adequate and unembarrassed remedy" by writ of *mandamus?*

The commissioners have acted, and acted before the complainant had notice, and the *mandamus*, if issued for any purpose, would be to compel them to *undo* what they have done—that is, that they give the company the right to close its gates and collect tolls. In the case of ex parte *Nash*, 15 Queen's Bench, 92, the Court say, "That inasmuch as a *mandamus* lies merely to command that to be done which by law ought to be done, and *not to order the undoing of that which ought not to be done*, it will not lie to to order a railroad company to take the seal off from the register of shareholders, on the suggestion that it was affixed without authority and contrary to law." Here the commissioners have acted, under the obligation of an oath, in a matter committed by law solely to their judgment and discretion. Who can now compel *them* to undo what they have done? If so, why swear them? A *mandamus* lies to compel an officer clothed with full or *quasi* judicial power to exercise these powers, not to correct his judgment after he has acted. 13 Pet., 279. This would be to substitute the judgment of the Circuit Judge for the commissioners, and to compel the commissioners to reverse their judgment, already given under oath. 4 Wallace, 522. An inferior tribunal may be compelled by *mandamus* to proceed to judgment, but not to substitute the judgment of the superior Courts for its own. These commissioners or superintendents are not merely ministerial officers, acting under the orders of a court or statute, without any judgment or dis-

cretion of their own; they are in a great degree clothed with judicial powers; they are required to take cognizance of facts, to-wit: the condition of the road; and to these facts apply the law, viz: the requirements of the charter; and upon these two propositions to give judgment. To admit that the Circuit Court can compel them to give judgment contrary to their consciences and their honest convictions would, to say the least, be very extraordinary. It will be kept in mind that the Circuit Judge, if he should differ with the commissioners, can not push them aside, and by his sheriff or other ministerial officer execute his own judgment, but would be compelled to act through the commissioners, and compel them to perform his judgment, and if they refused to send them to jail, or otherwise force them. This writ is only used in cases where the act to be done is merely ministerial, and the relator is without other adequate remedy. 17 Howard, 284; Id., 225; 1 Cranch, 137; 14 Pet., 497.

Again, a *mandamus* could not be granted where it would be unavailing, for the want of power in the defendants. 12 Barb., 217; 15 Id., 166; 24 Id., 156. If the defendants have exercised the power vested in them, and have not the right and power to review their own acts and undo them, the writ should be refused as vain and fruitless. 12 Barb., 217, 162, 52; 15 Id., 607. These commissioners have met and performed the acts required of them by law, whether properly or erroneously, have now no power to act

further in the matter, unless it be to give the owners of the road certificates to the effect that they have repaired their road, and even this power is not given in the statute. Neither will the writ be granted if the relator has any other adequate legal remedy. If he could sue the commissioners in trespass and recover of them damages for any wrong done him, then the writ will not lie. 10 John., 485; 1 Wend., 318; 2 Hill, 45; 6 Id., 243; 5 Hill, 616; 23 Wend., 458; 21 Wend., 20; 11 N. Y., 563. The foregoing constitute in part, but not wholly, the reasons why the proceeding by *mandamus* would not lie and could not be effective, and these principles have become too well rooted in the jurisprudence of the country to be questioned or disturbed. I therefore conclude that the complainant is compelled to apply to the Court, for the reason that it is without remedy elsewhere, and being here, we will proceed to examine the allegations of the bill, and as no answer has been put in, but the case stands on demurrer, for the present I am to take the bill as true in all its allegations.

Complainant alleges the Act of 1835 to be unconstitutional, in this, that it suspends a vested right to collect the tolls without due process or "due course of law," as it is expressed in our Constitution. That its rights are passed upon and judgment given without a trial, without witnesses, without a jury, in secret, without any of the forms common to courts of justice, without the privilege of appearing by its agents or counsel. "Due course of law" undoubtedly

means in due course of legal proceedings, according to those rules and forms which have been established for the benefit of private rights. 12 N. Y., 209. Mr. Justice Johnson, of the Supreme Court of the United States, in the case of *Bank of Columbia* v. *Oakley,* 4 Wheat., 235, has stated the meaning of these terms so accurately and truly as to defy criticism. "That they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice." "A hearing before condemnation and judgment before dispossession." Whatever may be the powers of the Legislature over remedies or purely remedial laws, no case, I presume, can be found in which this doctrine has been carried to the extent that the Legislature could divest rights without a hearing, and condemn the property of a party unheard, or otherwise affect him in his person or property. The intelligence of the present age denounces such absolute and arbitrary action of government as tyrannical, and refers it to that people whose fundamental laws are based upon unquestionable and absolute monarchy.

While this Act is subject to much and severe criticism, I shall refrain from further comment upon it, unless there are no other causes upon which a decision can be rested for the present.

The respondents have demurred to complainant's bill, and the cause is now being tried on demurrer, in the attitude of the pleadings, all the statements of

the bill are ‘ taken as true. Now, what are these? The turnpike company says in effect that its road is not up to the requirements of the law. I think this is fairly inferable from its ˙ allegations, but it says that the Legislature heretofore, and immediately after the war, passed an Act, which is set out in the bill, as follows: " That with a view to relieving the traveling community generally, and the incorporated turnpike companies of the State, permission is granted said turnpike companies to collect tolls at their several gates, the proceeds of the same, after paying expenses of collection, shall be appropriated to the repair of ,said roads until the same are made equal to the requirements of the original charter, when this Section shall cease to have any further effect."

It is claimed that the intention and effect of this Act was to pardon the roads from all penalties, notwithstanding their unlawful condition, provided the companies ˙devoted all the net profits to the improvement of the roads. ˙ This the Legislature would certainly have the power to do. After the close of the late war, when all or nearly all the roads of every description were out of repair, falling far short of that condition required by the law, and when there was but little inclination or ability on the part of the stockholders to rebuild them, and when probably each had forfeited its charter and stood at the mercy of the State to end their existence, it was a question addressed to the wisdom of the Legislature, and the

The White's Creek Turnpike Co., *v.* John W. Marshall *et al.*

policy to be pursued towards these companies, in view of the wants and necessities of the people of the State, whether they should cease or be continued, and if the latter, on what terms.    The Legislature might have required each company, on pain of forfeiture, to put its road immediately in that state of excellence required by their charters, or it might have allowed them to do this within any given time.    It refused to apply this rigorous rule, but on the contrary, enacted that said companies might have an indefinite time, provided they would apply all the net profits of the roads to the improvement of the same. This legislation was had in view of the fact. that the roads were not in the required condition, and its intent and inevitable effect was to pardon the companies and waive the enforcement of all penalties against them.    Certainly, after the passage of this Act, no company could have been indicted because its road was out of repair, nor could the commissioners have opened the gates; for this latter act would have been to deprive the companies of that very toll, the net profits of which the Legislature directed should be applied to the improvement of the road.    'T is needless to ask how the net profits of the toll could be applied to the improvement of the roads if the commissioners could open the gates and stop the collection of the same?    The Legislature, beyond all cavil, intended to pardon the companies so long as they used the net profits of the roads to their improvement.    The use of the net profits, then, was a

condition and proviso of the pardon, and any company failing so to apply the net profits waives the benefit of the pardon, and can not insist upon it. No person is bound to accept a pardon, and pardons can as well be upon conditions as unconditional, and a person claiming the benefit of a conditional pardon must show that he has accepted and performed all the conditions annexed.

Now this brings us to the allegations of the bill, and this alleges that the entire proceeds of the road, and more, have been devoted to this required purpose. Now, in the present state of the pleadings, the allegation is to be taken as true, no answer being before the Court, and therefore no denial of this fact. If this company has devoted all the net proceeds of its road, as required, and still with these expenditures the road has not reached the condition of excellence required by the charter, then the commissioners did wrong to open the gates. But the question here arises, was it the business of the commissioners to ascertain whether the net proceeds had been thus applied, and if the company, upon application, refused to disclose these facts, was it then the duty of the commissioners to throw open these gates for this refusal? This is assuming that the commissioners did not throw open the gates *solely* because the road was out of the required state of repairs, but for this cause, added to the fact that the company refused to make the requisite disclosures of expenditures to them. The duty of the commissioners, as declared by § 1277,

is to " see that the same (turnpike roads and toll-bridges) are kept in such repair as is required by law." By § 1282 it is declared that "whenever, in the opinion of a majority of said superintendents, any road or bridge shall manifestly be in *bad condition,* they may open the gates of such public way until it is put in good order and condition." This latter Section is certainly loosely drawn, and leaves a wide margin for discretion on the part of the superintendents. What is a "bad condition," or what is "good order and condition" for a road? More relative or uncertain terms could not certainly have been used. However, aided by the first Section, these terms have a certain and definite meaning, and must be held to mean such "repair as is required by law," or the *charter,* which is the law to them, and beyond this the State can exact nothing. A higher excellence the State did not contract for, and has no power to demand. These commissioners, then, are required to see that the roads are kept up to the demands of their respective charters, and to open the gates if they are not so kept. By this Act these superintendents or commissioners could look alone to the state of repair the road was in, and upon this hinged the question of opening the gates. It was not enjoined upon them to ascertain how much money had been expended upon the road; whether the expenditures exceeded or fell short of the net profits of the roads. This is nowhere made their duty by express language. Nor is it made their duty to see

9. vol. 2

that all the laws relative to turnpike roads are complied with, then their sole superintendence relates to the condition of the roads—to be ascertained upon personal inspection.   If it is to be held that the commissioners' powers were enlarged by the Act of 1865, and that by this Act it became their duty to ascertain whether the companies were expending all the net profits in the improvement of their respective roads, this certainly is to be derived by implication, because it is not thus written down and expressed in the Statute; and this is also applicable to the power to throw open the gates because of the failure to disclose the application of the profits—this is also not written down or nominated in the Statute.   Neither the commissioners nor their duties are referred to in the Act of 1865, and their existence is not inferable from anything in that Act.   Did the Legislature intend then to confer upon them the power to call before them the officers of the roads and examine them touching the receipts and expenditures of the companies, and if their summons were disobeyed, then give them the penal power of opening the gates and declare a *quasi* forfeiture? or did the Legislature reserve this power to the grand juries and criminal courts?   If it has become evident that a company is receiving a larger amount of tolls than it is appropriating to repair its roads, or that it is not honestly devoting its proceeds to this purpose, it is the duty of the grand jury to indict them for it.   On such a trial the State could show that the road was not

up to the required condition; the defendant could not plead and rely upon the pardon in the Statute of 1865, without showing that he or it had accepted the benefits of the Act, and performed all its conditions and requirements. I refer to this to show that if a company is not complying with the law, the State and citizens are not without remedy, efficient and unquestionable, and far superior in reference to respect for rights of all parties than to leave the matter in the hands of superintendents whose powers are questionable—to be gathered by implication—and which, if it be decided against them, exposes them personally to the perils of dangerous litigation.

Has not the State the power, through its attorney, to proceed at once against any such delinquent road for a forfeiture? What defense could it make to such a proceeding? The only evidence the State would have to adduce would be to show the condition of the road, and the company would have to deny the condition of repair, or admit it and take shelter under the pardon of the Act of 1865, and to do this it would be required to show a full compliance with all the terms of the pardon, to-wit: that the net profits had been honestly applied to repairs. In either case the burden of the proof of the application of the profits would be upon the company. So here we have full, complete and ample remedy in the regular and constitutional tribunal to correct all abuses, without exposing the commissioners to the danger of serious personal action for damages, if it

should be determined that in the discharge of their complicated duties, involving grave questions of constitutional law and facts, they have acted erroneously. For if it should turn out that the Act of 1835 is unconstitutional, it would afford them no shelter against a suit for damages, in which the company would recover such sum as the gates might have yielded to it during the period they were unlawfully closed, amounting in this case to several thousand dollars per year. Whatever may have been the motives that prompted this litigation (and much has been said upon this point), I have so far, and shall consider both parties as actuated by the highest motives of honor—the one to discharge the duties of a public trust, and the other to insist upon the enforcement of the laws governing private rights. Certainly the effect of this litigation is to transfer from the shoulders of the commissioners grave and serious responsibilities. I shall overrule the demurrer.